OHIO CIVIL RIGHTS COMMISSION ET AL., APPELLEES, v. AKRON
METROPOLITAN HOUSING AUTHORITY ET AL., APPELLANTS.

[Cite as *Ohio Civ. Rights Comm. v. Akron Metro. Hous.
Auth.*, 119 Ohio St.3d 77, 2008-Ohio-3320.]

(No. 2007–0254—Submitted February 26, 2008—Decided July 8, 2008.)

MOYER, C.J.

{¶ 1} This case raises a question of first impression in this court: May a landlord be held liable under R.C. 4112.02(H)(4) for failing to take corrective action against a tenant whose racial harassment of another tenant created a hostile housing environment? We hold that a landlord may not be held liable under R.C. 4112.02(H)(4) for failing to take corrective action against a tenant whose racial harassment of another tenant created a hostile housing environment. The decision of the court of appeals is therefore reversed.

I

{¶ 2} Appellee Fontella Harper and nonparty Beverly Kaisk lived in neighboring apartments at Van Buren Homes, a public housing development managed by appellant June Davidson and owned and operated by appellant Akron Metropolitan Housing Authority ("AMHA"). After a series of confrontations between Harper's family and Kaisk's family, appellee the Ohio Civil Rights Commission filed a complaint against AMHA and Davidson, alleging unlawful discrimination based on race in violation of R.C. 4112.02(H)(4). In particular, the complaint alleged that members of Kaisk's family had harassed members of Harper's family, that the harassment was racial in nature, and that AMHA and Davidson

had failed to take corrective action against Harper and her family, despite having notice of the nature of the harassment. Harper and appellee Fair Housing Advocates Association ("FHAA") later intervened as plaintiffs.

{¶ 3} In its complaint and subsequent motion for summary judgment, the commission alleged the following facts. Over the course of approximately a year, Harper's family and Kaisk's family had several heated confrontations in the vicinity of their apartments. On one occasion, Kaisk's daughter referred to members of Harper's family as "niggers" and "Black bitches," and the girl's father threatened Harper and her cousin with serious physical harm. On other occasions, members of Kaisk's family called Harper and her children "niggers, nigger lovers, Black bitch, * * * [and] Black fuckers." Before Kaisk and her family moved out of Van Buren Homes, Kaisk spoke with Harper and said, "[Y]ou Black bitch, I'm moving and you can't do anything about it."

{¶ 4} Harper spoke with a member of the building management about the first incident with Kaisk's daughter and the girl's father, describing the racially derogatory comments made by Kaisk's daughter. Harper also submitted written reports to Davidson about subsequent racial harassment.[1] Although a member of AMHA's security department may have investigated one complaint, neither Davidson nor the AMHA took any corrective action regarding the harassment. Under the lease signed by Kaisk, AHMA could terminate the lease "for serious or repeated violations of material terms of the lease." The lease included a provision requiring tenants to conduct themselves in a manner that "will not disturb the neighbors' peaceful enjoyment of their accommodations."

{¶ 5} The Court of Common Pleas of Summit County granted summary judgment in favor of the appellants. The Ninth District Court of Appeals reversed, holding that the trial court erred in not recognizing a cause of action for hostile housing environment. The Ninth District further held that the following elements are necessary to establish a prima facie case of hostile living environment: "(1) plaintiffs are members of a protected class, (2) the harassment was unwelcome, (3) the harassment was based on the plaintiffs' race, (4) the harassment was sufficiently severe or pervasive to alter the plaintiffs' living conditions and create an abusive environment, and (5) either (a) the harassment was committed by a landlord or (b) *the landlord, through its agents or supervisory personnel, knew or should have known about the harassment and failed to take*

---

1. AMHA and Davidson challenge Harper's claim that the building management was aware of the racial nature of the harassment. AMHA and Davidson also challenge Harper's claim that she submitted written reports about subsequent racial harassment. None of the written reports that were allegedly filed appear in the record.

*immediate and appropriate corrective action.*" (Emphasis added.) 170 Ohio App.3d 283, 2006-Ohio-6967, 866 N.E.2d 1127, ¶ 19.

{¶ 6} We accepted jurisdiction on the discretionary appeal.

## II

{¶ 7} This case raises the following question: May a landlord be held liable under R.C. 4112.02(H)(4) for failing to take corrective action against a tenant whose racial harassment of another tenant created a hostile housing environment?

{¶ 8} At the outset, it is important to distinguish this case from a claim of hostile housing environment in which a tenant alleges that the landlord or building supervisor created a hostile housing environment through his own harassment of the tenant. See, for example, *DiCenso v. Cisneros* (C.A.7, 1996), 96 F.3d 1004. We have not yet addressed whether such a cause of action exists under R.C. 4112.02(H)(4), and those facts are not before us. Rather, we consider whether a cause of action exists against a landlord who *failed to take corrective action* against a tenant whose racial harassment of another tenant created a hostile housing environment.

{¶ 9} R.C. 4112.02(H)(4) does not expressly recognize a cause of action against a landlord who fails to take corrective action in response to the creation of a hostile housing environment by one of his tenants. R.C. 4112.02(H)(4) provides only that it is an unlawful discriminatory practice for any person to "[d]iscriminate against any person in the terms or conditions of selling, transferring, assigning, renting, leasing, or subleasing any housing accommodations or in furnishing facilities, services, or privileges in connection with the ownership, occupancy, or use of any housing accommodations * * * because of race."

{¶ 10} In the absence of an express statutory command, the court of appeals found support for the cause of action at issue here in two types of cases: federal housing-discrimination cases and Ohio workplace-harassment cases. For the reasons described below, neither provides a compelling argument in favor of recognizing a cause of action against a landlord who failed to take corrective action in response to a hostile housing environment created by one of his tenants.

{¶ 11} We do not agree with the court of appeals' characterization of its holding as consistent with federal rulings on claims of hostile housing environment. Three of the six cases cited by the court of appeals involved claims of direct landlord harassment of tenants. See *DiCenso*, 96 F.3d 1004; *Honce v. Vigil* (C.A.10, 1993), 1 F.3d 1085, 1088; and *Smith v. Mission Assoc. Ltd. Partnership* (D.Kan.2002), 225 F.Supp.2d 1293. Another case involved claims of direct harassment by a homeowners' association, members of the homeowners' association who were the plaintiff's neighbors, and a corporation that acted in coopera-

tion with the homeowners' association. *Halprin v. Prairie Single Family Homes of Dearborn Park Assn.* (C.A.7, 2004), 388 F.3d 327, 330. Four of the six cases cited by the court of appeals thus arise from facts that are clearly distinguishable from the facts in this case.

{¶ 12} The remaining two federal cases cited by the court of appeals rely on authorities that are unconvincing. The first, *Neudecker v. Boisclair Corp.* (C.A.8, 2003), 351 F.3d 361, relies primarily on the authority of federal cases involving claims for hostile work environment to hold that a supervisor may be liable for one tenant's harassment of another tenant. As described below, we reject the argument that the principles of employer liability in hostile-work-environment claims should be used as models for landlord liability for the acts of tenants. Furthermore, the facts of *Neudecker* can be distinguished from the facts in the present case: in *Neudecker*, the parties accused of harassing the plaintiff on account of his disability were the children of building managers, and building managers had also committed overt acts of harassment against the plaintiff, including a threat of eviction in response to his harassment complaints.

{¶ 13} In the second remaining case cited by the court of appeals, *Bradley v. Carydale Ents.* (E.D.Va.1989), 707 F.Supp. 217, the United States District Court for the Eastern District of Virginia held that the toleration by the building owner, manager, and employees of harassment of tenants by other tenants was actionable under the Virginia Fair Housing Law pursuant to the court's broad reading of the statutory language. We do not find that court's broad application of the Virginia statute to be persuasive.

{¶ 14} The court of appeals' reliance on the cause of action for hostile work environment is also misplaced. The court of appeals implied, and the appellees argue, that we should recognize the present cause of action because we recognize a similar cause of action in the employment context: An employer may be held liable for a nonsupervisory employee's sexual harassment of his co-worker if the employer, through its agents or supervisory personnel, knew or should have known of the harassment and failed to take immediate and appropriate corrective action. *Hampel v. Food Ingredients Specialties, Inc.* (2000), 89 Ohio St.3d 169, 729 N.E.2d 726. We reject the argument that our precedent in the employment context requires us to recognize the cause of action in the landlord-tenant circumstances of this case.

{¶ 15} This court first recognized that an employer may be held liable for failing to take corrective action in response to co-worker sexual harassment in *Hampel*. The court in *Hampel* established the following elements for a hostile-environment sexual-harassment claim: "(1) that the harassment was unwelcome, (2) that the harassment was based on sex, (3) that the harassing conduct was sufficiently severe or pervasive to affect the 'terms, conditions, or privileges of

employment, or any matter directly or indirectly related to employment,' and (4) that either (a) the harassment was committed by a supervisor, or (b) *the employer, through its agents or supervisory personnel, knew or should have known of the harassment and failed to take immediate and appropriate corrective action.*" (Emphasis added.) Id. at paragraph two of the syllabus.

{¶ 16} The statutory language at issue in *Hampel* did not explicitly recognize a cause of action against an employer for failing to take corrective action in response to co-worker sexual harassment. R.C. 4112.02(A) provides only that it is an unlawful discriminatory practice "[f]or any employer, because of the * * * sex * * * of any person, * * * to discriminate against that person with respect to hire, tenure, terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment."

{¶ 17} The court in *Hampel* extended liability to employers who "knew or should have known" of the harassment on the authority of applicable federal case law: "[T]he federal courts uniformly apply a 'known or should have known' test in determining an employer's liability for harassment by nonsupervisory coworkers or nonemployees." Id., 89 Ohio St.3d at 177, 729 N.E.2d 726, fn. 2, citing *Burlington Industries, Inc. v. Ellerth* (1998), 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633; and *Faragher v. Boca Raton* (1998), 524 U.S. 775, 118 S.Ct. 2275, 141 L.Ed.2d 662.

{¶ 18} In *Burlington Industries* and *Faragher,* the United States Supreme Court noted that imposing liability on an employer who knew or should have known about co-worker harassment was an application of negligence liability. In *Faragher,* the Supreme Court noted in dicta that "combined knowledge and inaction may be seen as demonstrable negligence." Id. at 789, 118 S.Ct. 2275, 141 L.Ed.2d 662. In *Burlington Industries,* 524 U.S. at 759, 118 S.Ct. 2257, 141 L.Ed.2d 633, the Supreme Court noted, also in dicta, that "[a]n employer is negligent with respect to sexual harassment if it knew or should have known about the conduct and failed to stop it."

{¶ 19} This liability of an employer for an employee's negligence derives from the established principles of agency law. In *Burlington,* the Supreme Court discussed employer liability for the tortious actions of an employee in the context of master-servant liability, noting that a master is not liable for the torts of a servant acting outside the scope of employment unless one of four factors exists. Id. at 758, 118 S.Ct. 2257, 141 L.Ed.2d 633, citing 1 Restatement of the Law 2d, Agency (1958), Section 219(2). None of those factors apply to the liability of a landlord for the actions of a tenant.

{¶ 20} The agency principles that govern employer-employee liability have no parallel in the context of landlord-tenant disputes: "The relation of landlord and tenant in itself involves no idea of representation or of agency. It is a relation

existing between two independent contracting parties. The landlord is not responsible to third persons for the torts of his tenant." *Midland Oil Co. v. Thigpen* (C.A.8, 1925), 4 F.2d 85, 91. See also *Darnell v. Columbus Show-Case Co.* (1907), 129 Ga. 62, 65, 58 S.E. 631 ("a tortious act done by one tenant to another tenant of a common landlord, without the authority, consent, or connivance of the landlord, is not the latter's tort, but the tort of him who does the act").

{¶ 21} The amount of control that a landlord exercises over his tenant is not comparable to that which an employer exercises over his employee. As the appellants observe, a landlord does enjoy a measure of control through his ability to evict tenants. In the present case, the lease signed by Kaisk gives the AMHA authority to evict a tenant who disturbs other tenants' "peaceful enjoyment of their accommodations." The power of eviction alone, however, is insufficient to hold a landlord liable for his tenant's tortious actions against another tenant. See *Siino v. Reices* (1995), 216 A.D.2d 552, 553, 628 N.Y.S.2d 757 ("Absent authority to control the conduct of a third person, a landowner does not have a duty to protect a tenant from the conduct of another tenant. A reasonable opportunity or effective means to control a third person does not arise from the mere power to evict." [Citations omitted] ). We therefore reject the argument that our precedent in the employment context applies to the cause of action at issue here.

{¶ 22} Finally, we decline the request by appellees Harper and FHAA to recognize this action under the statutory command that R.C. Chapter 4112 "shall be construed liberally for the accomplishment of its purposes." R.C. 4112.08. Although the conduct alleged by the appellees is reprehensible, we decline to extend liability to behavior so far beyond the reach of the statutory language, especially in light of the absence of an agency relationship between a landlord and his tenants and the landlord's comparative lack of control over his tenants.

III

{¶ 23} For the foregoing reasons, we hold that a tenant may not bring a claim against his landlord under R.C. 4112.02(H)(4) when racial harassment by another tenant creates a hostile housing environment.

{¶ 24} The judgment of the court of appeals is reversed.

Judgment reversed.

PFEIFER, LUNDBERG STRATTON, O'CONNOR, O'DONNELL, LANZINGER, and CUPP, JJ., concur.

---

Nancy Hardin Rogers, Attorney General, William P. Marshall, Solicitor General, Elise W. Porter and Robert J. Krummen, Deputy Solicitors, and David A.

Oppenheimer and Sharon D. Tassie, Assistant Attorneys General, for appellee Ohio Civil Rights Commission.

Margolius, Margolius & Associates, Andrew L. Margolius, and Emily E. Warren, for appellees Fontella Harper and Fair Housing Advocates Association.

Michele Morris, Richard A. Green, and James D. Casey, for appellants.

Fair Housing Law Clinic, Edward G. Kramer, and Kenneth J. Kowalski, urging affirmance for amicus curiae the Housing Advocates, Inc.

Relman & Dane, P.L.L.C., and Stephen M. Dane, urging affirmance for amici curiae National Fair Housing Alliance, Inc., Miami Valley Fair Housing Center, Inc., Housing Research & Advocacy Center, Heights Community Congress, Fair Housing Contact Service, Housing Opportunities Made Equal of Greater Cincinnati, Toledo Fair Housing Center, the John Marshall Law School Fair Housing Legal Support Center, Akron Branch NAACP, Urban League of Greater Cincinnati, Lorain County Urban League, Coalition on Homelessness and Housing in Ohio, St. Bernard Catholic Church, Equal Justice Foundation, and City of Barberton Law Department.

Lisa L. Walker, urging reversal for amicus curiae Housing and Development Law Institute.

Reno & Cavanaugh, P.L.L.S., Stephen I. Holmquist, Jaime Lee, Sarah Molseed, and Casius Pealer, urging reversal for amici curiae Council of Large Public Housing Authorities, National Apartment Association, National Association of Housing and Redevelopment Officials, National Leased Housing Association, National Multi Housing Council, and Public Housing Authorities Directors Association.